# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| BRENDA G. LITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No._____ |
| | ) | Judge: _____ |
| v. | ) | |
| | ) | |
| RHA HEALTH SERVICES, LLC, | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, BRENDA G. LITTLE, by and through counsel, who hereby sues the Defendant, RHA HEALTH SERVICES, LLC, and for cause of action would show unto this Honorable Court as follows:

1. The Plaintiff, Brenda Little, is a citizen and resident of Knoxville, Knox County, Tennessee.

2. The Defendant, RHA Health Services, LLC, is a limited liability company authorized to do business in the State of Tennessee, with its principal place of business located at 17 Church Street, Asheville, NC, 28801-3303, and may be served through its Registered Agent, C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit: 42 U.S.C. § 12101, *et seq.*

4. Venue is proper under the codes cited herein, and pursuant to the code provisions of 29 U.S.C. § 1391.

5. At all times stated herein, the Defendant is an employer engaging in an industry affecting commerce.

6. At all times stated herein, the Defendant employed more than 100 employees.

7. At all times stated herein, the Defendant was, and currently is, an "employer" and "covered entity" within the meaning of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101, *et seq*.

8. At all times stated herein, the Defendant was an employer subject to the provisions of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

9. The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., defines "disability" as follows:

1) Disability: The term "disability" means, with respect to an individual-

   A.) a physical or mental impairment that substantially limits one or more major life activities of such individual;
   B.) a record of such an impairment; or
   C.) being regard as having such an impairment (as described in paragraph (3)).

2) Major Life Activities:
   A.) In general
       For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
   B.) Major bodily functions
       For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.
   C.) An individual meets the requirements of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

10. The Equal Employment Opportunity Commission's (hereinafter "EEOC") regulations define "impairment," in part, as:

"(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems, neurological,

musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; …" 29 C.F.R. § 1630.2.

11. The EEOC's regulations define "major life activities," in part, as including, but not limited to:

"(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentration, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2.

12. Plaintiff was originally hired by Defendant on December 9, 2019 as a Licensed Practical Nurse (hereinafter "LPN").

13. At all times stated herein, Plaintiff was qualified for the position of LPN.

14. During her employment, Plaintiff never received any writeups or other disciplinary actions.

15. During her employment, Plaintiff provided care to patients located in the east Tennessee area.

16. Throughout her employment, Plaintiff successfully performed her job duties.

17. Throughout her employment, Plaintiff was never told that her performance was deficient or needed to improve.

18. Throughout her employment, Plaintiff performed her LPN position in a satisfactory manner.

19. After Plaintiff was hired up until her termination, Plaintiff reported to and was supervised by the Director of Nursing, Diane Conatser.

20. After Plaintiff was hired up until her termination, Plaintiff also reported to and was supervised by the Nurse Supervisor, Juanita Johnson.

21. At all times material hereto, Kim Perkins was Defendant's Regional Administrator.

22. At all times material hereto, Diane Conatser was an agent and employee of Defendant.

23. During the time Plaintiff worked for Defendant, Diane Conatser had authority to discipline the Plaintiff up to, and including, termination.

24. At all times material hereto, Juanita Johnson was an agent and employee of Defendant.

25. During the time Plaintiff worked for Defendant, Juanita Johnson had authority to discipline the Plaintiff up to, and including, termination.

26. At all times material hereto, Kim Perkins was an agent and employee of Defendant.

27. During the time Plaintiff worked for Defendant, Kim Perkins had authority to discipline the Plaintiff up to, and including, termination.

28. While working on August 20, 2021, Plaintiff suffered from a myocardial infarction (hereinafter "heart attack"), but she was not aware that she was having a heart attack, and she continued to work on August 21, 22, and 23, 2021.

29. On August 25, 2021, Plaintiff went to her cardiologist and was diagnosed as having a heart attack and cardiovascular disease, and Plaintiff was admitted to the emergency room.

30. On August 30, 2021, Plaintiff had a coronary artery bypass surgery in connection with the heart attack and cardiovascular disease.

31. Plaintiff remained in the hospital until September 4, 2021.

32. After Plaintiff left the hospital, she underwent cardiac rehabilitation therapy from December 2021 until early February 2022.

33. Immediately following Plaintiff's heart attack and during her recovery, Plaintiff notified Defendant of her condition and that she would need time off from work.

34. Plaintiff applied, and was approved, for short-term disability from early September 2021 until the end of November 2021.

35. Plaintiff requested long-term disability in December 2021, but it was not approved. As a result, Plaintiff was on unpaid leave from December 2021 until the time of her termination on June 22, 2022.

36. As of August 20, 2021, forward, Plaintiff's cardiovascular disease and heart attack substantially limited Plaintiff's ability to perform major life activities, including, but not limited to, standing, lifting, pushing, pulling, and bending, as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

37. As of August 20, 2021, forward, Plaintiff's cardiovascular disease was a physiological condition affecting one or more of the Plaintiff's bodily functions, including her cardiovascular system, as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

38. As of August 20, 2021, forward, Plaintiff's cardiovascular disease was a physical impairment, as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

39. Plaintiff's cardiovascular disease is a disability as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

40. During Plaintiff's recovery, Plaintiff communicated with Defendant, including her supervisor, Conatser, regarding the status of her recovery and when she intended to return to work.

41. In February of 2022, Plaintiff informed Conatser that Plaintiff understood that she would be released to return to work soon and would continue to update Conatser.

42. On March 17, 2022, Plaintiff asked Conatser when she could return to work, and Plaintiff further informed Conatser that her doctor gave her verbal work restrictions limiting her lifting to 50 pounds occasionally.

43. In response, Conatser requested that Plaintiff provide a medical note from her doctor stating the work restrictions.

44. On April 26, 2022, Plaintiff provided her doctor's medical note to Defendant advising that Plaintiff could return to work on April 29, 2022. (A true and exact copy of the April 26, 2022 Doctor's Note is attached hereto as Exhibit 1).

45. The medical note further stated: "I would recommend lifting no more than 50 pounds occasionally; should there be a need for greater lifting, hopefully a co-worked [sic] can be of assistance." (Exh. 1).

46. On April 26, 2022, Plaintiff requested that Defendant provide her with a reasonable accommodation consistent with her doctor's orders. (*See* Exh. 1).

47. On April 26, 2022, Plaintiff requested lifting restrictions as a reasonable accommodation for her disability.

48. Plaintiff's requested accommodations consistent with her doctor's orders (Exh. 1) were "reasonable accommodations" as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

49. Plaintiff could perform the essential functions of her LPN position with the above-referenced reasonable accommodations.

50. Plaintiff provided her doctor's note (Exh. 1) to Defendant, including Conatser and Human Resources representative, LeeAnne Fletcher.

51. At all times material hereto, LeeAnne Fletcher was an agent and employee of Defendant.

52. During the time Plaintiff worked for Defendant, LeeAnne Fletcher had authority to discipline the Plaintiff up to, and including, termination.

53. After receiving Plaintiff's doctor's note (Exh. 1), Defendant did not permit Plaintiff to return to work.

54. After receiving Plaintiff's doctor's note (Exh. 1), Plaintiff repeatedly contacted employees of Defendant, including Conatser, Perkins, Fletcher, and other Human Resources employees, regarding when she would be permitted to return to work, but she was only told that Defendant was reviewing her request to return to work and otherwise refused to give Plaintiff a definitive answer regarding when she could return to work.

55. After repeatedly requesting to return to work, on May 13, 2022, Conatser informed Plaintiff that Fletcher no longer worked for Defendant and that Plaintiff should contact another Human Resources representative, Barbara (last name unknown).

56. Thereafter, Plaintiff continued to contact Defendant, including Conatser, Perkins, and the Human Resources as well as the corporate office, but Defendant would only tell Plaintiff that it was still reviewing Plaintiff's request to return to work.

57. In early June 2022, Conatser informed Plaintiff that Defendant needed additional information from Plaintiff's doctor and gave Plaintiff an LPN job description for her doctor to review and Plaintiff to sign. (A true and exact copy of the June 9, 2022 job description is attached hereto as Exhibit 2).

58. The LPN job description provided to Plaintiff in June of 2022 (Exh. 2) was the most recent version of the LPN job description at that time.

59. The LPN job description provided to Plaintiff in June of 2022 (Exh. 2) was prepared by Defendant.

60. The LPN job description provided to Plaintiff in June of 2022 (Exh. 2) was provided by Defendant in response to Plaintiff's Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission (hereinafter "EEOC").

61. With respect to the "Essential" physical requirements of the LPN position given to Plaintiff in early June 2022, the job description provides, in part:

> Regular required to lift 20 lbs. Must be able to lift a minimum of 40 lbs. Must be able to pull minimum of 25 lbs. (Exh. 2).

62. Plaintiff could therefore perform the above-referenced "essential" physical requirements of the LPN position—*i.e.*, regularly lifting 20 pounds, lifting a minimum of 40 pounds, and pulling a minimum of 25 pounds—in accordance with her doctor's note stating he recommended "lifting no more than 50 pounds occasionally…." (at Exh. 1).

63. Further, the job description stated that the physical requirements can be met "With or without the aid of mechanical devices." (Exh. 2).

64. During Plaintiff's employment, she had available and used mechanical devices, including a Hoyer lift, designed to make it easier to lift and move patients.

65. On June 9, 2022, Plaintiff took the job description (Exh. 2) to her medical provider to review and approve, and Plaintiff's medical provider approved the job description and provided another medical note to Defendant regarding Plaintiff's work restrictions. (A true and exact copy of the June 9, 2022 medical note is attached hereto as Exhibit 3).

66. The June 9, 2022 medical note stated:

> Per Dr. Johnson's note 4/26/22, she is acceptable to return to work. She could lift 50 pounds occasionally but not routinely. If heavier lifting is required, assistance of a coworker is recommended. This limitation is related primarily to her cervical disc disease. (*See* Exh. 3).

67. Defendant was aware that Plaintiff had cervical disc disease because she had to previously miss work due to this condition in December 2020.

68. Plaintiff's cervical disc disease substantially limited her ability to perform major life activities, including, but not limited to, standing, lifting, pushing, pulling, and bending, as defined in the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

69. Plaintiff's cervical disc disease was a physiological condition affecting one or more of the Plaintiff's bodily functions, including her neurological and musculoskeletal system, as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

70. Plaintiff's cervical disc disease is a physical impairment, as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

71. Plaintiff's cervical disc disease is a disability, as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

72. After receiving the June 9, 2022 medical note (Exh. 3) and job description (Exh. 2), Plaintiff certified that she was able to perform the minimum lifting requirements of her LPN position.

73. In fact, as shown by the job description (Exh. 2), Plaintiff was able to comply with the minimum lifting requirement of 40 pounds even without any accommodation.

74. Plaintiff's lifting restrictions prohibited her from only occasionally lifting more than 50 pounds. (*See* Exhs. 1 and 3).

75. Permitting Plaintiff to return to work with the lifting restrictions set forth in Plaintiff's medical note (Exh. 3) would have been a "reasonable accommodation" as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

76. Defendant was able to accommodate Plaintiff's lifting restrictions set forth in her medical note (at Exh. 3) in order to allow Plaintiff to return to work.

77. Permitting Plaintiff to return to work with the lifting restrictions set forth in Plaintiff's doctor's note (Exh. 3), would not have been an "undue burden" on Defendant as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

78. Although Plaintiff was able to meet the essential lifting requirements of the LPN position, to address Defendant's asserted concerns, Plaintiff also requested Defendant modify her work schedule or assigned location so that there would be other employees present during Plaintiff's shift if she needed assistance lifting.

79. Plaintiff requested the reasonable accommodation of modifying her work schedule or assigned location as an alternative reasonable accommodation to permit her to return to work.

80. Throughout Plaintiff's employment, Defendant employed LPNs that worked schedules that had other employees and individuals present during their shifts.

81. Permitting Plaintiff to modify her work schedule or assigned location would have been a "reasonable accommodation" as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

82. Permitting Plaintiff to modify her work schedule or assigned location would not have been an "undue burden" to Defendant as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

83. After Plaintiff provided the June 9, 2022 medical note (Exh. 3) and job description (Exh. 2) to Defendant, Plaintiff was still not told that she could return to work.

84. Plaintiff thereafter repeatedly called Defendant, including Human Resources and the corporate office, but she did not receive any update about her return to work.

85. On June 22, 2022, Plaintiff received a call from a Human Resources Representative, informing her that she was terminated.

86. During the termination call on June 22, 2022, Defendant's Human Resources Representative stated that Plaintiff was "no longer needed" because Defendant could not accommodate her medical restrictions.

87. Thereafter, Plaintiff received a Separation Notice dated June 22, 2022 asserting as the reason for termination: "Ms. Little has medical restrictions from her physician that we are unable to accommodate due to the nature of our business." (A true and exact copy of the Separation Notice is attached hereto as Exhibit 4).

88. The justification for termination as set forth in the Separation Notice (at Exh. 4) is false.

89. When Plaintiff originally received the Separation Notice (Exh. 4), it was unsigned, and Plaintiff took the Separation Notice to Defendant's office in Knoxville, TN and had Regional Administrator, Kim Perkins, sign it. (Exh. 4).

90. It is Defendant's position that the sole basis for Plaintiff's termination is that it was unable to accommodate Plaintiff's medical restriction of limiting her lifting to 50 pounds occasionally.

91. When Plaintiff was advised of her termination on June 22, 2022, there was no reference to Plaintiff's work performance as a basis for her termination.

92. Prior to Plaintiff's termination, Defendant was aware and/or had knowledge of Plaintiff's disabilities.

93. Prior to Plaintiff's termination, Defendant was aware and/or had knowledge of Plaintiff's cardiovascular disease.

94. Prior to Plaintiff's termination, Defendant was aware and/or had knowledge of Plaintiff's cervical disc disease.

95. Prior to Plaintiff's termination, Conatser was aware and/or had knowledge of Plaintiff's cardiovascular disease.

96. Prior to Plaintiff's termination, Conatser was aware and/or had knowledge of Plaintiff's cervical disc disease.

97. Prior to Plaintiff's termination, Perkins was aware and/or had knowledge of Plaintiff's cardiovascular disease.

98. Prior to Plaintiff's termination, Perkins was aware and/or had knowledge of Plaintiff's cervical disc disease.

99. Prior to Plaintiff's termination, Defendant was aware that Plaintiff had been placed on lifting restrictions.

100. Prior to Plaintiff's termination, Conatser was aware that Plaintiff had been placed on lifting restrictions.

101. Prior to Plaintiff's termination, Perkins was aware that Plaintiff had been placed on lifting restrictions.

102. Prior to Plaintiff's termination, Defendant was aware that Plaintiff had requested reasonable accommodations.

103. Prior to Plaintiff's termination, Conatser was aware that Plaintiff had requested reasonable accommodations.

104. Prior to Plaintiff's termination, Perkins was aware that Plaintiff had requested reasonable accommodations.

105. Plaintiff's requested reasonable accommodations, including lifting restrictions and/or modifying Plaintiff's schedule or assigned location, were made in good faith.

106. Plaintiff's requests for reasonable accommodations, including lifting restrictions and/or modifying Plaintiff's schedule or assigned location, were protected activities under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

107. The Defendant had the ability to accommodate Plaintiff's requested lifting restrictions.

108. The Defendant had the ability to accommodate Plaintiff's request to modify her schedule or assigned location.

109. Plaintiff was able to perform the essential functions of her job with the reasonable accommodations that she requested for her lifting restrictions.

110. Plaintiff was able to perform the essential functions of her job with the reasonable accommodations that she requested for modification of her schedule or assigned location.

111. Plaintiff's reasonable accommodations did not impose an "undue burden" on the Defendant within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

112. The reason given for Plaintiff's termination is trumped up and untrue.

113. After her termination, upon information and belief, Plaintiff was replaced by an employee that did not have a disability and did not require any reasonable accommodations.

114. After her termination, upon information and belief, the person(s) taking over Plaintiff's job duties did not have a disability and did not require any reasonable accommodations.

115. Employers have a duty to reasonably accommodate the disabilities of qualified employees.

116. Employers have a duty to engage in the interactive process in good faith for purposes of determining whether a requested reasonable accommodation can be granted.

117. As a result of the Defendant's conduct as set forth herein, Plaintiff filed a timely Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission

(hereinafter "EEOC") on September 20, 2022. (A true and exact copy of the Charge is attached hereto as Exhibit 5, and same is incorporated herein by reference).

118. Plaintiff's EEOC Charge (Exh. 5) was timely filed with the EEOC.

119. The Plaintiff received a Notice of Right to Sue from the EEOC dated June 22, 2023. (A copy of the Notice of Right to Sue is attached as Exhibit 6).

120. This Complaint is filed within ninety (90) days of the date of the Notice of Right to Sue. (*See* Exh. 6).

121. This suit is timely filed.

122. The real reason for Plaintiff's termination was due to her disability, and/or record of impairment, and/or because she was regarded as disabled, and/or due to her requesting reasonable accommodations, and/or because Defendant refused to provide Plaintiff with a reasonable accommodation, and/or because Defendant refused to engage in the interactive accommodation process in good faith, and/or in retaliation for engaging in protected activities, including requesting reasonable accommodations, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

123. Defendant is responsible and liable for the discriminatory and retaliatory actions of its agents and employees under the doctrine of respondent superior and under agency principles.

124. As a result of Defendant's conduct, the Plaintiff sustained great and irreparable loss of tangible job benefits, including a loss of income and benefits, both past and future, and she sustained other pecuniary losses, and Plaintiff further sustained, and will continue to sustain, great emotional distress, humiliation and embarrassment, damage to reputation and character.

125. Defendant's conduct was with malice and/or reckless disregard to Plaintiff's federally protected rights and is sufficient to justify the imposition of substantial punitive damages.

**WHEREFORE**, Plaintiff prays for judgment against the Defendant, and Plaintiff prays for the following relief:

1. Compensatory damages, including back pay and front pay (or, in the alternative, reinstatement, if the Court deems it appropriate);

2. Punitive damages;

3. Prejudgment interest;

4. Reasonable attorney's fees;

5. The costs of this action;

6. A jury to try this cause; and

7. Appropriate equitable relief, including, ordering Defendant to abide by the above-referenced statutes, and the applicable rules and regulations of the EEOC, and for management level employees to receive appropriate training.

RESPECTFULLY SUBMITTED this the 29th day of August, 2023.

**THE BURKHALTER LAW FIRM, P.C.**

s/Zachary J. Burkhalter
David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
Attorneys for Plaintiff
111 South Central Street
PO Box 2777
Knoxville, Tennessee 37901
(865) 524-4974